# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ———————————————— ) | | |
| **ALLISON M.,** ) | | |
| ) | | |
| **Plaintiff,** ) | | |
| ) | | **Civil Action No.** |
| **v.** ) | | **22-10033-FDS** |
| ) | | |
| **KILOLO KIJAKAZI, Acting Commissioner,** ) | | |
| **Social Security Administration,** ) | | |
| ) | | |
| **Defendant.** ) | | |
| ———————————————— ) | | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR ORDER REVERSING COMMISSIONER'S DECISION AND DEFENDANT'S MOTION FOR ORDER AFFIRMING COMMISSIONER'S DECISION

**SAYLOR, C.J.**

This is an appeal from the final decision of the Commissioner of the Social Security Administration denying an application for supplemental security income ("SSI") benefits. Plaintiff Allison M. alleges that she became disabled on March 7, 2019, after various impairments rendered her unable to work. She submitted medical records indicating that she suffers from various ailments, including anxiety disorder, depressive disorder, and lumbar degenerative disc disease. She now disputes the Commissioner's holding that she is not "disabled" within the meaning of the Social Security Act.

Pending before the Court is plaintiff's motion to reverse and the Commissioner's motion to affirm. For the reasons below, plaintiff's motion to reverse and remand will be denied and the Commissioner's motion to affirm will be granted.

## I.   **Background**

The following is a summary of the evidence in the administrative record ("A.R.").

### A.  **Education and Occupational History**

Allison M. was born on June 26, 1988.  (A.R. 70).  She was 30 years old at the alleged onset of her disability on March 7, 2019.  (*Id.* at 15).[1]

Plaintiff has a high-school education up to the tenth grade and received her G.E.D.  (*Id.* at 40).  She has no past work experience.  (*Id.* at 40, 206).

### B.  **Medical History**

Plaintiff alleges that she cannot work due to various physical and mental-health impairments, including anxiety disorder, depressive disorder, and lumbar degenerative disc disease.  (*Id.* at 17).[2]

In her April 2019 function report, plaintiff indicated the following:  she is too tired and too nervous to do housework, yard work, or prepare meals; she either sleeps too much or does not get enough sleep; she has trouble concentrating, becomes nervous, and gets migraines when attempting to do hobbies or pursue her interests; and she needs reminders to take her medication. (*Id.* at 199-203).[3]  In addition, she stated during her testimony that, because of her depression, she would stay in bed all day three to four days a week.  (*Id.* at 51-52).  Her June 2019 disability reports indicate that she was treated or evaluated for anxiety, depression, and degenerative disc disease with lower-back pain and left-leg pain and numbness.  (*Id.* at 189-91, 217-19).

---

[1] Plaintiff originally reported the onset date of her disability to be August 2, 2018, but that was amended to March 7, 2019, at her hearing on June 15, 2020.  (*Id.* at 15, 39).

[2] She also alleges various other impairments including borderline intellectual functioning, hyperglycemia, hyperlipidemia, and headaches.  (*Id.* at 17, 39).

[3] However, she indicated in her function report that she can pay bills and handle money, despite her medical conditions.  (*Id.* at 201-02).

Primary-care records from plaintiff's December 8, 2017, annual physical examination indicate that she "[h]as chronic anxiety, agoraphobia, [and] at times [finds it] difficult to leave the house." (*Id.* at 290). Her anxiety is characterized as "[s]evere, chronic but stable" and her depression symptoms as "stable, but still somewhat present." (*Id.* at 289-90). Plaintiff also completed a PHQ-9 depression assessment test and received a score of 5, suggesting mild depression. (*Id.* at 290).[4] She also indicated that she suffers from back pain and chronic migraines. (*Id.*). Her back pain began days before the annual physical "when she moved slightly after carrying [her] cat in a cat carrier from the vet's office." (*Id.*).

The note from plaintiff's December 12, 2018, annual physical examination indicated that she "has not been able to work in the past" and "[n]eeds forms filled out for financial assistance," and that she is "[v]ery anxious, [and] gets nervous around other people." (*Id.* at 282). Her active problems included anxiety, recurrent major depressive disorder (in partial remission), insomnia, agoraphobia with panic attacks, and migraine headaches. (*Id.*). Her PHQ-9 depression assessment test score was 11, suggesting moderate depression. (*Id.* at 282). She reported that her back pain is "improved but still present" and that she was "working on yoga, gentle exercise," and was taking analgesics as needed. (*Id.* at 280).

At a follow-up appointment in May 2019, plaintiff disclosed that she had been experiencing pain in her left leg along with her persistent lower-back pain. (*Id.* at 321). This pain was "preventing her from doing some normal activities due to worsening with bending, twisting, lifting." (*Id.*). On May 29, 2019, she underwent an MRI, which indicated that she had

---

[4] At her six-month follow-up, she was still indicating that she "gets depressed mood at times," has "chronic anxiety, and gets very nervous about being in public, leaving the house, etc." and "has insomnia at times." (*Id.* at 287). Her PHQ-9 depression assessment test score increased to 8, indicating mild depression. (*Id.*).

a "large central disc herniation" at the L4-L5 level and a "tiny bulge of the disc" at the L5-S1 level, which was "consistent with her symptoms." (*Id.* at 413).

Plaintiff saw Dr. Michael Harrison, M.D., a neurosurgeon, for lower-back pain twice. (*Id.* at 411-13). In his August 2019 progress notes, he indicated that he was pleased with plaintiff's progress as her pain went from an "8/10 to essentially 0/10." (*Id*. at 409). On a questionnaire provided by plaintiff's counsel, Dr. Harrison indicated that plaintiff's herniated disc was "resolved." (*Id.* at 400). He also opined that she could sit for two hours at a time and about four hours total per day; she could stand for an hour at a time and about four hours total per day; her symptoms are unlikely to interfere with attention and concentration; and she was capable of "moderate stress – normal work." (*Id.* at 401-03).

On September 25, 2019, Dr. Carlos Correia, M.D., a primary-care physician who has been treating plaintiff since at least March 2015, examined her for depression and anxiety and indicated that she "seems to be stable." (*Id.* at 295, 385-86). Plaintiff's PHQ-9 depression assessment test resulted in a score of 13—a slight increase, indicating moderate depression. (*Id.* at 386). Dr. Correia noted that she was on an increased dosage of BuSpar and "seem[ed] to be doing better" with her anxiety. (*Id.* at 385-86).[5]

In March 2020, Dr. Correia noted that plaintiff's active physical problems addressed at the visit were mixed hyperlipidemia, hyperglycemia (although this was "unprioritized"), and conditions relating to her low-back issues. (*Id.* at 427-28). He noted that "she is going to the gym on a regular basis to try and build up her muscles and was doing much better" but "started

---

[5] Primary-care records from that visit indicate active diagnoses of anxiety; recurrent major depressive disorder, in partial remission; insomnia; agoraphobia with panic attacks; migraine headaches; hyperglycemia; mixed hyperlipidemia; chronic bilateral low-back pain with left-sided sciatica; and herniated lumbar intervertebral disc. (*Id.* at 426).

with low back pain 2-3 days ago." (*Id.* at 429). Her recurrent major depression remained "stable." (*Id.* at 428).

Plaintiff saw a nurse practitioner and a licensed independent clinical social worker at Boston Neurobehavioral Associates on multiple occasions. (*Id.* at 344-80, 391-97, 435-458). Treatment records from these visits indicate that she experiences fluctuations in the severity of her depression and anxiety. (*See generally id.*). At her August 2019 appointment, Cheryl McGuire, N.P., noted that plaintiff reported an improved mood and decreased anxiety. (*Id.* at 377). McGuire also noted that she "appears friendly, attentive, communicative, casually groomed and fully oriented." (*Id.*).

In contrast, at her appointment one month later, she reported increased anxiety "due to current life stressors" stemming from living in an unsafe neighborhood and having her temporary disability benefits cut off. (*Id.* at 374). Along with her daily medication, she managed spikes in anxiety with marijuana and by engaging in activities with her boyfriend, such as going to the park, movies, and shopping. (*Id.* at 393).

At plaintiff's January 2020 appointment, she reported anxiety over new tenants in her apartment building and her partner's weight. (*Id.* at 441). She also discussed her goals, which were to move, get married, and have children. (*Id.*). The following month, she indicated that she was still distressed by the new tenants and her boyfriend's weight; she also noted that she would like to go to hairstyling school. (*Id.* at 438).

### C.  Additional Medical Examinations or Opinions by State Agency Consultants

In May and June 2019, four medical experts from the state's Disability Determination Services evaluated plaintiffs' records and considered the degree of her limitations.  (*Id.* at 57-84).

On May 2, 2019, state agency consultant John J. Warren, Ed.D., evaluated plaintiff.  (*Id.* at 60-62).  Warren concluded that her ability to understand, remember, or apply information; her ability to interact with others; her ability to concentrate, persist, or maintain pace; and her ability to adapt and manage herself were all moderately limited.  (*Id*. at 61).  Overall, he opined that her "actual mental status appreciations generally unremarkable" and that she "retains the capacity to perform basic tasks and relate with others well enough for routine workplace purposes."  (*Id.* at 62).

Warren also performed a mental residual functional capacity assessment.  (*Id.* at 64-67).  As to plaintiff's social interactions, he concluded that she is moderately limited in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors, and not significantly limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (*Id.* at 66).  As to her ability to adapt, Warren concluded that she is moderately limited in the ability to respond appropriately to changes in the work setting and in the ability to set realistic goals or make plans independently of others, and not significantly limited in the ability to be aware of normal hazards and take appropriate precautions.  (*Id.*).

State agency consultant Dr. Lucinda Wheelock, M.D., conducted a physical residual functional capacity assessment on May 16, 2019.  (*Id.* at 63-64).  Dr. Wheelock concluded that she was capable of the following:  occasionally lifting 20 pounds; frequently lifting 10 pounds; standing and/or walking (with normal breaks) for six hours out of an eight-hour workday; and

sitting (with normal breaks) for six hours out of an eight-hour workday.  (*Id.* at 63).  Dr. Wheelock concluded that she was capable of occasionally climbing ladders, ropes, and scaffolds, and occasionally bending at the waist.  (*Id.* at 64).

On July 24, 2019, state agency psychologist Isabel C. Murphy, Psy.D., evaluated plaintiff.  (*Id.* at 75-77).  She determined that plaintiff is limited in the same activities and to the same degree as Warren had previously determined.  (*Id.* at 75, 79-81).

On July 24, 2019, state agency consultant Dr. Wayne Draper, M.D., performed a physical residual functional capacity assessment of plaintiff.  (*Id.* at 77-79).  He confirmed that she is physically limited to the same degree that Dr. Wheelock found, except that he found that she was never capable of climbing ladders, ropes, and scaffolds.  (*Id.* at 77-79).

### D.  <u>Vocational Expert Testimony</u>

Vocational expert Barry Hensley testified at plaintiff's hearing.  (*Id.* at 52).  The ALJ asked him to identify jobs "with an SVP level of 1, off-task 10% of the time, sedentary, but with each hand, the maximum would be five pounds.[6]  And the concentration is up to two hours at a time."  (*Id.*).  Hensley responded that there were no jobs "for SVP1 with that description."  (*Id.* at 53).  The ALJ then asked about jobs at the SVP 2 level.  (*Id.* at 53).  Because the ALJ was looking for a job with a sedentary position, Hensley's initial suggestion—a laundry sorter—was out of the question.  (*Id.* at 53-54).  Given this, he proposed jobs as inspector and ampoule sealer as "the two jobs that would be available."  (*Id.* at 54).

---

[6] A specific vocational preparation rating ("SVP") indicates the amount of time needed to learn the job. The Department of Labor assigns an SVP ranging from one to nine to each job.  Unskilled work corresponds to SVP 1-2, semi-skilled work corresponds to SVP 3-4, and skilled work corresponds to SVP 5-9.  SSR 00-4p, 2000 WL 1898704, at *3 (December 4, 2000).

### E.  Procedural History

On March 7, 2019, plaintiff applied for SSI benefits, alleging that she became disabled on August 2, 2018.  (*Id.* at 149-64, 183).  The Commissioner denied her claim both initially on May 16, 2019, and upon reconsideration on July 24, 2019.  (*Id.* at 57-68, 70-83).  On September 13, 2019, plaintiff filed a written request for a hearing.  (*Id.* at 98-100).  The hearing was held telephonically on June 15, 2020.  (*Id.* at 34-56).  Plaintiff appeared and testified at the hearing.  (*Id.* at 35).

On July 10, 2020, the ALJ concluded that plaintiff was not disabled.  (*Id.* at 24).

Plaintiff requested a review of the ALJ's decision.  (*Id.* at 144-46).  On December 1, 2020, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner.  (*Id.* at 1).  This appeal followed.

## II.  Analysis

### A.  Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see also Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards, and found facts upon the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision if the ALJ ignored evidence or made legal or factual errors. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D. Mass. Mar. 2, 2013) ("[I]f the ALJ made a legal or factual error, the Court may reverse or remand such decision . . . ." (citation omitted)).  Accordingly, if the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court can not conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation.").  Questions of law are reviewed de novo. *Seavey*, 276 F.3d at 9.

### B.  Standard for Entitlement to SSI Benefits

In order to qualify for SSI benefits, the claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act.  42 U.S.C. §§ 1382(a)(1), 1382c(a)(3) (setting forth the definition of "disabled" in the context of SSI).  "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairment must be severe enough to prevent a plaintiff from performing not only past work, but any substantial gainful work existing in the national economy.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.960(c)(1).

The Commissioner uses a sequential five-step process to evaluate whether a claimant is disabled.  *See Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001); 20 C.F.R. § 416.920.  Those steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 416.920(a)(4).  "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  At that juncture, the ALJ assesses the claimant's Residual Functional Capacity ("RFC") in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether he or she can engage in any kind of substantial gainful work which exists in the national economy.  20 C.F.R. §§ 416.920(g), 416.960(c).

### C.  <u>The Administrative Law Judge's Findings</u>

In evaluating the evidence, the ALJ followed the established five-step procedure set forth in 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found plaintiff had not engaged in "substantial gainful activity since March 7, 2019."  (A.R. at 17).

At step two, the ALJ addressed the severity of plaintiff's impairments.  She concluded that plaintiff has the following severe impairments:  anxiety disorder, depressive disorder, and lumbar degenerative disc disease.  (*Id.* at 17).  Those impairments significantly limit her ability

to perform basic work activities as required by SSR 85-28.  (*Id.*).  The ALJ noted that while

plaintiff also suffers from hyperglycemia, hyperlipidemia, and headaches, none of those

conditions were severe impairments.  (*Id.*).  The ALJ concluded that her records reveal "no

significant treatment or complications for these conditions . . . ."  (*Id.*).

At step three, the ALJ found that those severe impairments, or their combination, did not

meet or medically equal the severity of one of the listed impairments under 20 C.F.R. Part 404,

Subpart P, App. 1.  (*Id.* at 18).  The ALJ stated that plaintiff's "degenerative disc disease does

not meet Listing 1.04" for the following reasons:

> because the record does not demonstrate compromise of a nerve root (including
> the cauda equina) or the spinal cord with additional findings of:  A) evidence of
> nerve root compression characterized by neuro-anatomic distribution of pain,
> limitation of motion of the spine, motor loss (atrophy with associated muscle
> weakness) accompanied by sensory or reflex loss and, if there is involvement of
> the lower back, positive straight-leg raising; or B) spinal arachnoiditis; or C)
> lumbar spinal stenosis resulting in pseudoclaudication.  MRI reveals no nerve root
> compression, and physical examinations demonstrate normal motor strength and
> no sensory loss.

(*Id.*).

The ALJ stated that plaintiff's depression and anxiety, "considered singly and in

combination, do not meet or medically equal the criteria of listings 12.04 and 12.06" and noted

that, in making that finding, she considered whether the "paragraph B" criteria were satisfied.

(*Id.*).  "To satisfy the paragraph B criteria, [the] mental disorder must result in 'extreme'

limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  20

C.F.R. Part 404, Subpart P, App. 1, 12.00 Mental Disorders.  Those four areas are:  "understand,

remember, or apply information; interact with others; concentrate, persist, or maintain pace; and

adapt or manage oneself."  (*Id.*).

The ALJ concluded that the "paragraph B" criteria were not met because plaintiff had

only a mild limitation for understanding, remembering, or applying information; a mild

limitation for interacting with others; a moderate limitation for concentrating, persisting, or maintaining pace; and a moderate limitation for adapting or managing herself. (A.R. at 18-19). In addition, the ALJ found that she did not satisfy the "paragraph C" criteria. While plaintiff had "a medically documented history of a mental disorder that has lasted for at least two [] years," and was receiving treatment in the form of outpatient therapy and medication, the evidence failed to show that she had achieved only a marginal adjustment as a result of that treatment. (*Id.* at 19). Rather, the ALJ concluded that it was clear that she had no problems with personal care, attending medical appointments, taking care of personal needs, maintaining appropriate grooming and hygiene, managing finances, and interacting with providers and staff. (*Id.*).

At step four, the ALJ determined that plaintiff had no past relevant work under 20 C.F.R. § 416.965. (*Id.* at 22).

After consideration of the entire record, the ALJ concluded that plaintiff had the "residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) except the claimant is limited to unskilled SVP 2 level work, entailing simple instructions and simple repetitive tasks, concentration up to two hours at one time; off-task 10 percent; and can lift five pounds with each hand." (A.R. 19-20).

In making that finding, the ALJ followed a two-step process. (*Id.* at 20). First, she considered whether there were underlying medically determinable physical or mental impairments—that is, impairments that could be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce plaintiff's pain or other symptoms. (*Id.*). Second, she evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limited plaintiff's work-related activities. (*Id.*). For that purpose, whenever statements about intensity, persistence, and limiting

effect were not substantiated by objective medical evidence, he considered other evidence in the record to determine whether the symptoms limited the ability to perform work-related activities. (*Id.*).

At the first step of the two-step process, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the physical and psychological symptoms the ALJ testified to experiencing.  (*Id.* at 21).  But at the second step of the two-step process, she found that plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence of record, which did not support the level of severity alleged.  (*Id.*).

In making those determinations, the ALJ stated that she did not defer to or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions.  (*Id.* at 22).  She noted that she found Dr. Harrison's opinion "only somewhat persuasive to the extent consistent with the overall medical evidence" because it was "based on only two visits," and "not consistent with the overall physical examinations reflecting unremarkable findings."  (*Id.*).  Furthermore, the ALJ stated Dr. Harrison's opinions on plaintiff's mental limitations were not persuasive given "psychology is not Dr. Harrison's field of expertise."  (*Id.*).  Accordingly, she did not adopt the specific limitations Dr. Harrison provided.  (*Id.*).

The ALJ did not find the opinions of the state agency consultants that plaintiff has "overall moderate mental limitations" persuasive because "they are not based on examinations of the claimant, and the opinions are not entirely consistent with the overall medical evidence reflecting unremarkable mental status examinations."  (*Id.*).  However, the ALJ found the limitation to light exertion persuasive because it was "consistent with the overall unremarkable

13

physical examination findings, management with conservative treatment, reports of no limitations with personal care, and reports of exercise." (*Id.*).  The ALJ claimed that "greater accommodations have been provided in the RFC giving the claimant the benefit of the doubt as to her complaints of ongoing pain." (*Id.*).

Overall, the ALJ found that the residual functional capacity assessment was supported by the medical evidence of record, overall unremarkable examinations, "consistent management with conservative treatment despite ongoing complaints of anxiety, depression, and back pain," lack of follow-up with specialists, and by "normal" performance of daily living activities. (*Id.* at 22).

At step five, ALJ found that a significant number of jobs existed in the national economy that plaintiff could perform, accounting for her age, education, work experience, and RFC. (*Id.* at 23); *see also* 20 C.F.R. §§ 416.969, 416.969a.  To determine the extent to which plaintiff's limitations impeded her ability to perform unskilled sedentary work, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC. (A.R. at 23)  The vocational expert testified that a person with plaintiff's characteristics could work as an inspector or ampoule sealer. (*Id.*).  The ALJ concluded that, after considering the expert testimony and plaintiff's characteristics, plaintiff could make a successful adjustment to work that exists in significant numbers in the national economy. (*Id.*).  She therefore concluded that plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at 24).

### D.  Plaintiff's Objections

Plaintiff contends that the decisions of the ALJ in two areas were not based on substantial evidence and contained errors of law:  (1) the ALJ's findings concerning headaches, and (2) the ALJ's RFC determination.

### 1.   The ALJ's Findings Concerning Headaches

Plaintiff contends that the ALJ erroneously concluded that her headaches were not a severe impairment, resulting in an RFC that did not adequately consider headache-based limitations.  Defendant responds that substantial evidence supports the ALJ's step two finding that plaintiff's alleged headaches were not severe.

### a.   Whether the ALJ Erred in Categorizing Plaintiff's Headaches as Not Severe

At step two, the ALJ concluded that the record showed no significant treatment or complications for headaches, hyperglycemia, or hyperlipidemia, and that plaintiff's physical examinations were "intact overall."  (A.R. at 17).  While the ALJ did not expressly state that she found the conditions to be "non-severe," she implied as much by discussing the standard for "non-severe" impairments and then noting that she had considered all of plaintiff's medically determinable impairments, including those that were not severe.  (*Id.* at 17).

"Step two is a de minimis screening device of claims for benefits, where 'a finding of 'non-severe' is only to be made where medical evidence establishes only a light abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . .'" *Dunn v. Colvin*, 2016 WL 4435079, at *8 (D. Mass. Aug. 19, 2016) (quoting *McDonald v. Secretary of Health & Hum. Servs.*, 795 F.2d 1118, 1124-25 (1st Cir. 1986)).  "In deciding whether migraines constitute a severe impairment, courts look to the frequency of the headaches, whether the claimant was able to work, whether the headaches

15

dissipated with treatment, and whether the claimant had to seek urgent care because of ongoing headache symptoms." *Id.* at *9.

There is substantial evidence in the record to support the ALJ's finding that plaintiff's headaches were not a severe impairment. The medical records indicate that her migraine headaches were "recurrent/chronic," "occasional," and "stable," and that she used analgesics as needed. (A.R. at 281, 290). Plaintiff also reported that using marijuana alleviated migraine symptoms. (*Id.* at 361). However, there is no evidence that she was prescribed medication or otherwise treated for migraines, nor that they had an appreciable effect on her physical or mental functioning. In fact, the record reveals that she engages in a range of activities despite symptoms from her various alleged impairments, including going to movies or parks, shopping with her boyfriend, doing yoga, going to the gym, and caring for her cats. (*Id.* at 393, 435, 438, 456). Based on that evidence, it was reasonable for the ALJ to conclude that plaintiff's migraine headaches were not severe. *Compare Andrade v. Colvin*, 2015 WL 5749446, at *5-6 (D. Mass. Sept. 30, 2015) (upholding finding that migraines were not severe where they were amenable to treatment and did not significantly limit daily activities), *with Brown v. Astrue*, 2011 WL 3421556, at *2, *4 (D. Mass. Aug. 3, 2011) (migraines found to be severe where they forced plaintiff to seek emergency treatment), *and Dunn*, 2016 WL 4435079, at *12 (ALJ erred in concluding that migraines were not severe where plaintiff experienced consistent symptoms, was prescribed medication, and was inhibited in work activity).

Even if the ALJ had erred in deciding that the headaches were not severe, that error was harmless. The aim of step two is to determine whether the claimant has at least one medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 416.920(c). Where an ALJ deems at least one impairment severe, she is required to

consider non-severe impairments when assessing the RFC under step four.  *Sacilowski v. Saul*, 959 F.3d 431, 440 (1st Cir. 2020) ("[S]everity does not relieve an ALJ of his obligation to consider a non-severe impairment's impact on a claimant's overall medical condition."); SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").  Therefore, any error in failing to deem a certain impairment severe does not by itself warrant reversal.  *See Andrade*, 2015 WL 5749446, at *6 (any error in finding that migraine headaches or seizure disorder were not severe was harmless in light of the ALJ's obligation to consider non-severe impairments in the RFC); *Noel v. Astrue*, 2012 WL 2862141, at *6 (D. Mass. Jul. 10, 2012) (same).

Here, the ALJ concluded that plaintiff had at least one severe medically determinable impairment and proceeded to step three.  Accordingly, any error in concluding that the headaches were not severe is harmless, unless the omission results in an RFC that does not incorporate the impairment.

### b.  **Whether the ALJ Erred by Failing to Apply SSR 19-4p**

Plaintiff next contends that the ALJ erred by failing to address Social Security Ruling 19-4p or explain why her migraines were not medically equal to Listing 11.02B.  SSR 19-4p explains how to establish that a person has a medically determinable impairment ("MDI") of a primary headache disorder and how to evaluate such an MDI in a disability claim.  SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019).  While primary headache disorder is not on the Listing of Impairments, the SSR instructs that the closest analogous listing is epilepsy (Listing 11.02).  *Id.* at *7.

An ALJ's failure to cite an applicable SSR "does not establish reversible error in the absence of any showing that the decision is materially inconsistent with the regulation." *Begin v. Saul*, 2021 WL 4177687, at *4 (D.N.H. Sept. 14, 2021) (quoting *Diaz v. United States Soc. Sec. Admin. Acting Com'r*, 2015 WL 5331285, at *2 (D.N.H. Sept. 14, 2015)).  In addition, "[a]n ALJ's failure to address a specific listing or to elaborate on her conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Monteiro v. Saul*, 2022 WL 867988, at *5 (D. Mass. Mar. 23, 2022) (quoting *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017)).

Here, the ALJ apparently determined that the migraine headaches were an MDI.  (A.R. at 17).  However, plaintiff has failed to identify evidence in the record showing that her migraines or headaches medically equal Listing 11.02B.  According to SSR 19-4p, a finding that a primary headache disorder is equal in severity and duration to epilepsy under Listing 11.02(B) requires a detailed description from an acceptable medical source of a typical headache event, and evidence of frequency, treatment, side effects of treatment, and limitations in functioning. SSR 19-4p, 2019 WL 4169635, at *7.  There is no evidence in the record describing plaintiff's headaches, her treatment (beyond self-medication with marijuana), or how they limit her functioning.

Accordingly, there is substantial evidence to support the ALJ's implicit finding that plaintiff's migraine headaches were not medically equal to a listed disability, and therefore the failure to mention SSR 19-4p was harmless.  *Compare George Paul B. v. Kijakazi*, 2022 WL 1684670, at *3-4 (D. Kan. May 26, 2022) (finding failure to discuss Listing 11.02 and SSR 19-4p harmless error where no evidence suggested severity equal to the listing), *with Dainton v. Comm'r of Soc. Sec.*, 2023 WL 2657639, at *6-7 (E.D. Tex. Mar. 9, 2023) (concluding that

discussion of SSR 19-4p was necessary where treating neurologist substantiated reports of disabling headaches, plaintiff sought emergency care and EEG results were consistent with seizures, and primary-care physical provided medical opinion supporting a finding of migraines); *Johnson v. Comm'r of Soc. Sec.*, 2023 WL 181090, at *3 (W.D. Mo. Jan. 13, 2023) (discussion of SSR 19-4p was required where plaintiff had migraine headaches multiple times a week and took medication to reduce their severity).

Accordingly, under the circumstances, the Court finds that the ALJ did not commit reversible error in declining to expressly consider SSR 19-4p.

### 2.   The ALJ's RFC Finding

Plaintiff also seeks reversal on the basis of the RFC at step four.  An RFC is "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1).  At step four of the review, the ALJ found that the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a), "except the claimant is limited to unskilled SVP 2 level work, entailing simple instructions and simple repetitive tasks, concentration up to two hours at one time; off-task 10 percent; and can lift five pounds with each hand." (A.R. at 20).

Plaintiff raises three grounds for reversal:  (1) the ALJ improperly included an SVP rating in the RFC; (2) the ALJ directed the vocational expert to produce testimony consistent with the ALJ's predetermined outcome; and (3) the RFC was unsupported by the evidence.

### a.   Whether the Inclusion of an SVP was Reversible Error

As an initial matter, the mere inclusion of an SVP in the RFC does not require reversal. Plaintiff contends that because an SVP indicates the time needed to learn a job, rather than her limitations, the inclusion of the SVP "usurp[ed]" the vocational expert's role by characterizing the RFC in vocational terms.  Each SVP corresponds to a skill level defined in 20 C.F.R.

404.1568 and 416.968.  SVP 2 corresponds to "unskilled" work.  "Unskilled work" is a term of art defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).  SSR 85-15 states that the "basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985).

Other courts have established that "unskilled work" can be "used as shorthand for the specific mental abilities described in SSR 85-15."  *Jaramillo v. Colvin*, 576 F. App'x 870, 875 (10th Cir. 2014); *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (finding no error where ALJ accounted for limitations by restricting RFC to unskilled work, framed as SVP 1 or 2). While the ALJ perhaps added a step of inference by referring to the SVP, she clarified that she was limiting plaintiff to "unskilled" work "entailing simple instructions and simple repetitive tasks," with the additional limitations that she could not concentrate for more than two hours at a time and could be off-task 10% of the time.  (A.R. 20).  That contextualization of the SVP clarified that the ALJ was using the term to refer to plaintiff's functional limitations.  *See Baker v. Soc. Sec. Admin. Comm'r*, 2011 WL 1298694, at *3 (D. Me. Mar. 31, 2011), *adopted*, 2011 WL 1481310 (D. Me. Apr. 19, 2011).  Therefore, the inclusion of the SVP level, without more, was not reversible error.

### b.  Whether the ALJ Erred in Framing the Hypothetical

Plaintiff next objects that the ALJ crafted an RFC that was not based on the "most [plaintiff could] still do," but was instead designed to deny plaintiff's claim for benefits.  In

support of that argument, plaintiff points to an exchange between the ALJ and the vocational

expert at the denial of benefits hearing.  The ALJ posed the following "hypothetical":

> Thirty-one years old and has a GED.  And I would like something with an SVP
> level of 1, off-task 10% of the time, sedentary, but with each hand, the maximum
> would be five pounds.  And the concentration is up to two hours at a time.  Can
> you give us two or three jobs?

(A.R. 52-53).  After the vocational expert responded that the did not "have any jobs for SVP1

with that description," the ALJ asked whether there were jobs available "where they trim a rug or

something like that, hand out towels?  Nothing?"  (*Id.* at 53).  When the expert again declined,

the ALJ stated "we'll have to go to SVP2" and asked for "[a]s simple a job as you have.  A

simple, repetitive task, simple instructions."  (*Id.*).  The vocational expert then provided two

jobs:  inspector and ampoule sealer.  (*Id.* at 53-54).

       According to plaintiff, the hypothetical reveals that the ALJ effectively worked

backwards, concluding that she would deny the claim before searching for the least restrictive

RFC that would result in a finding of available jobs.

       That allegation is unconvincing.  By beginning with a more restrictive RFC, the ALJ

ensured that she had "a broad basis under which to make a determination."  *Powers v. Comm'r of

Soc. Sec.*, 2014 WL 861541, at *5 (E.D. Mich. Mar. 5, 2014).  "In general, a hypothetical is

appropriate if the question accurately reflects the objective medical findings in the record."

*Cohen v. Astrue*, 851 F. Supp. 2d 277, 284 (D. Mass. 2012).  "Simply put, 'the hypothetical

posed to a [vocational] expert must include all of the claimant's relevant impairments.'"

*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 183 (D. Mass. 2015) (quoting *Aho v. Comm'r of Soc.

Sec. Admin.*, 2011 WL 3511518, at *7 (D. Mass. Aug. 10, 2011)).

       The ALJ's hypothetical, though perhaps inartfully phrased, included limitations that were

reasonably inferred from plaintiff's medical records and supported by expert testimony.  The

ALJ considered the testimony of Dr. Harrison that she could sit for two hours at a time, stand for

one hour at a time, lift and carry 10 pounds, and is capable of moderate stress.  (A.R. at 22).

Warren opined that plaintiff "retains the capacity to perform basic tasks and relate with others

well enough for routine workplace purposes" and could "carry out regular tasks in a daily

schedule with appropriate social interaction."  (*Id.* at 61, 100).  In addition, treatment records

from plaintiff's mental status examinations consistently show findings of cooperative attitude,

memory intact, intact insight and judgment, and normal attention span.  (*Id.* at 355, 427, 432,

435, 438-9, 447-9).  Therefore, it was reasonable for the ALJ to conclude that plaintiff's mental

abilities align with the those required for unskilled work under SSR 85-15, and to suggest so by

using that terminology in her hypothetical.

Accordingly, the ALJ's hypothetical does not require reversal.

### 3. Whether the RFC Is Supported by the Medical Evidence

Finally, plaintiff contends that the ALJ's eventual RFC determination was unsupported

by the evidence.  Specifically, she asserts that the 10% off-task target was not supported by the

testimony of the state agency consultants or a treating source, and the target disregarded

limitations caused by her headaches.

The evidence in the record supports a lower off-task percentage than that specified by the

ALJ.  Warren opined that plaintiff can "sustain the mental demands associated with carrying out

simple tasks over the course of routine workday/workweek within acceptable attention,

persistence, pace tolerances," while Dr. Harrison opined that she would be off-task 0% of the

time.  (*Id.* at 66, 403).  In the RFC, the ALJ "[gave] the claimant the benefit of the doubt as to

her complaints of ongoing pain."  (*Id.* at 22).  "If the RFC includes greater limitations than those

in a physician's assessment, such limitations cannot be used to discount the ALJ's

determination." *Yearling v. Colvin*, 292 F. Supp. 3d 515, 520 (D. Mass. 2017).  Plaintiff has not shown how she is prejudiced by the adoption of a more restrictive RFC, and therefore, "insofar as there is any error on the part of the ALJ, it is harmless."  *Smith v. Berryhill*, 370 F. Supp. 3d 282, 289 (D. Mass. 2019).

Plaintiff further contends that the ALJ did not consider the limitations caused by her headaches.  However, the ALJ explicitly stated that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity" and "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (A.R. 17, 20).  The ALJ is not required to discuss every piece of evidence in the record when making their decision.  *Santiago v. Sec'y of Health & Human Servs.*, 1995 WL 30568, at *4 (1st Cir. Jan. 25, 1995).  Furthermore, neither plaintiff nor her attorney mentioned headaches during the hearing, (A.R. at 43-56), and when prompted to list all physical or mental conditions that limit her ability to work, plaintiff only reported anxiety and depression, (*Id.* at 186).  As discussed above, and as affirmed by the medical experts' assessments, plaintiff's treatment records show unremarkable findings concerning her migraines.  (*Id.* at 57-84).

Accordingly, the ALJ's ultimate RFC determination does not warrant reversal.

**III.    Conclusion**

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion to affirm the action of the Commissioner is AFFIRMED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  August 31, 2023                      Chief Judge, United States District Court